# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**UNITED STATES OF AMERICA**

-vs-                                                                Case No. 6:09-cr-76-Orl-31DAB

**FRANK MAURICE MILLS**
_____

# ORDER

This matter came before the Court upon consideration of Defendant's, Frank Maurice Mills ("Defendant"), Motion to Suppress (the "Motion") (Doc. 16) and the Government's, the United States of America (the "Government"), amended response in opposition thereto (the "Response") (Doc. 19). The Court held an evidentiary hearing on June 9, 2010.[1] (Doc. 20).

In his Motion, Defendant moves to suppress, *inter alia*, a firearm seized as a result of an allegedly unlawful search of his vehicle.

## I. Factual Background

At approximately midnight on November 13, 2008, Officer Sharon Ring, an Orlando Police Department ("OPD") officer with approximately two years of experience, pulled her patrol car behind a black 2005 Chevrolet Monte Carlo that was traveling west on Orange Center Boulevard in Orlando, Florida. Defendant, a twenty-four year old African-American, was driving the vehicle. As Defendant continued to travel west, he noticed Officer Ring's patrol car. At the intersection of Orange Center Boulevard and Golgwyn Avenue, Defendant entered the left turn lane, turned on his turn signal, and waited for the light to turn green. Defendant then turned left and proceeded south on Golgwyn Avenue. Officer Ring followed. As Defendant continued to head south, he approached a steady red light at the intersection of Golgwyn Avenue and Colombia

---

[1]Citations to the transcript of the hearing are cited to herein as "(Tr. at [page])."

Street.² (Tr. at 3). The intersection included a painted "stop bar" and a crosswalk.³ According to Officer Ring, Defendant came to a complete stop approximately six to eight feet beyond the stop bar (and within the crosswalk) before making a right-hand turn onto Colombia Street. (Tr. at 3).⁴ Defendant's failure to come to a complete stop before entering the crosswalk was a noncriminal violation of FLA. STAT. § 316.075.⁵

---

²The intersection of Golgywn Avenue and Columbia Street is located approximately two miles west-southwest of the Parramore neighborhood near downtown Orlando in OPD's "West Patrol" sector. According to the U.S. Census Bureau, the neighborhood (specifically, tracts 0117.01 and 0117.02) in which Defendant was detained is more than 92% black. *See* U.S. Census Bureau, CenStats Databases, Census Tract Street Locator, FFIEC Geocoding System for 1192 Golgwyn Avenue and 1224 Mable Butler Avenue, Orlando, Florida, 32805, Get Census Demographic, Population Data, at http://censtats.census.gov and http://www.ffiec.gov/Geocode/default.aspx.

³Columbia Street arches southeast before the intersection, consequently, a driver traveling south on Golgywn Avenue and making a right-hand turn to travel west on Columbia Street necessarily must pull up beyond the stop bar in order to have a clear view of approaching traffic.

⁴Although Officer Ring testified during the hearing that Defendant came to a complete stop, her police report indicates that Defendant did not come to a complete stop. (Tr. at 23). Defendant testified that he crossed over the stop bar, but that he came to a complete stop before crossing over the crosswalk and entering the intersection. (Tr. at 54).

⁵In pertinent part, this statute provides:

(1) (c) *Steady red indication. - -*

Vehicular traffic facing a steady red signal shall stop before entering the crosswalk on the near side of the intersection or, if none, then before entering the intersection and shall remain standing until a green indication is shown; however:

a. The driver of a vehicle which is stopped at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or, if none then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection in obedience to a steady red signal may make a right turn. . . .

(4) A violation of this section is a noncriminal traffic infraction, punishable pursuant to chapter 318 . . . as a moving [i.e. traffic] violation.

FLA. STAT. § 317.075. A literal reading of the statute therefore requires the vehicle to stop behind the crosswalk (not the stop bar), unless turning right. In that event, the vehicle arguably must stop behind the stop bar in accordance with (1)(c)a. (nothing in the statute, however, clearly prohibits a failure to

After observing the traffic violation, Officer Ring ran Defendant's tag number, determined that the vehicle was registered to Defendant, and decided to conduct a stop. Officer Ring turned on her emergency lights and called for backup because she noticed that were multiple occupants in the vehicle.[6] (Tr. at 10). Defendant promptly turned left onto Mable Butler Boulevard and came to a complete stop.[7] (Tr. at 10). Officer Ring approached the vehicle and made contact with Defendant, obtained his driver's license and registration, and received identification from the vehicle's other three occupants.[8] (Tr. at 11-12). According to Officer Ring, she proceeded to ask Defendant – before any of the other officers arrived – the following "routine"[9] questions:

- Do you have any guns, drugs, knives or drug paraphernalia?

- Do you mind if I search your vehicle?

(Tr. 12 and 15).[10] According to Officer Ring, Defendant answered "No" to the first question and "No, I don't mind" (i.e., indicating his consent) to the second question.

---

stop behind the stop bar when turning right on red – that requirement is simply a part of the exception, which a vehicle "may" do). Although ambiguous, the Court finds, as discussed further, *infra*, that Defendant violated the statute.

[6]There were three male passengers in Defendant's vehicle – one sitting in the passenger seat and two in the back seat.

[7]It is undisputed that Defendant made no effort to evade Officer Ring and that he promptly pulled over after the lights and siren were activated on Officer Ring's patrol car.

[8]According to Officer Ring, Defendant "was very nice and cooperative" and promptly handed her his license and registration. (Tr. at 12).

[9]Officer Ring testified that she always asks these questions during every traffic stop, regardless of whether she has any reason to suspect that there are drugs or guns in the vehicle. (Tr. at 29-31). According to her, she uses these questions as "an investigation tool, because I like to see how people react. . . ." According to Officer Holmes (whose testimony is discussed, *infra*), about 70% of all vehicles that he stops for routine traffic violations in the "West Patrol" sector are searched. (Tr. at 50). This amounts to several thousand searches per year per officer in this area of Orlando.

[10]It is undisputed that Officer Ring did not suspect Defendant or any other occupant in the vehicle of committing any crime at the time she asked these questions. (Tr. at 25).

There is conflicting testimony, however, as to both when (and whether) Officer Ring asked the foregoing questions and, assuming that she did, whether Defendant actually said "No, I don't mind" (or otherwise gave his consent to the search). According to Officer Holmes, who was the third officer to arrive as backup, Officer Ring's initial encounter with Defendant occurred after backup had arrived and in the presence of three other officers.[11] Officer Holmes was standing two to three feet behind Officer Ring while she questioned Defendant. (Tr. at 39). The other two officers were on the passenger side of Defendant's vehicle. (Tr. at 39). In addition to Defendant's testimony,[12] Officer Holmes testified that he only heard Officer Ring ask for Defendant's license and registration. (Tr. at 40). He never heard Officer Ring ask Defendant whether he would consent to a search of his vehicle (Tr. at 47 and 49). Nor did Officer Holmes hear Defendant give his consent. (Tr. at 49). Furthermore, the Government represented to the Court that the two other officers at the scene – who did not appear or testify at the hearing – never heard Officer Ring ask Defendant for his consent to conduct a search. (Tr. at 51).

After Officer Ring had obtained Defendant's driver's license and registration, she went back to her vehicle and radioed to check for any outstanding warrants on the vehicle's occupants. (Tr. at 12-13). Officer Ring discovered that the front seat passenger had a juvenile custody order.[13] Upon learning this information, Officer Ring ordered all of the passengers out of the vehicle. She then began her search and quickly found a Taurus nine-millimeter handgun in or under the center

---

[11]Though not entirely clear, the Government's Response appears to substantiate (or at least fails to contradict) Officer Holmes' testimony that he was already at the scene when Officer Ring had her initial encounter with Defendant. (Doc. 18 at 2).

[12]Defendant testified that Officer Ringer never asked for his consent and that he never gave his consent for a search. (Tr. at 56).

[13]A juvenile custody order is similar to, but not the same as, a criminal warrant. (Tr. at 14).

-4-

console. She then arrested Defendant for possession of a concealed weapon.[14] (Tr. 15-16). Defendant was then Mirandized by Officer Holmes and admitted that he knew the gun was in the vehicle, but denied his ownership of it. (Tr. at 45).

**II. Standard of Review**

The Fourth Amendment protects individuals from unreasonable searches and seizures. The "touchstone of the Fourth Amendment is reasonableness," as measured by an examination of the totality of circumstances. *Katz v. U.S.*, 389 U.S. 347, 360 (1967); *see also*, *e.g.*, *United States v. Purcell*, 236 F.3d 1274, 1277-78 (11th Cir. 2001) (internal citations omitted). "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

    **a. Seizure**

A traffic stop is considered a limited form of seizure within the meaning of the Fourth Amendment and is analogous to an investigative detention. *Purcell*, 236 F.3d at 1277. Accordingly, the legality of a traffic stop is governed by *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* Under *Terry*, an officer's actions during a traffic stop must be "reasonabl[y] related in scope to the circumstances which justified the interference in the first place." *Id.* (quotation omitted). Stops initiated on the basis of probable cause to believe a traffic violation occurred are reasonable. *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999); *see also*, *e.g.*, *United States v.*

---

[14] Officer Ring's testimony and her police report intimates that the gun was "hidden" below the plastic cup holder in the center console. (Doc. 22-1 at 1). Numerous vehicles, however, have multiple center console compartments (many of which are below the cup holders or below some other removable component within the console). Neither party offered any evidence concerning the center console of the vehicle at issue here, including, *inter alia*, whether the console had been modified in some way to create a hidden compartment. In any event, Officer Ring apparently had no trouble locating the weapon in the short order.

*Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (holding officer had probable cause to stop a taxicab because he observed the cab fail to signal during a lane change). When determining whether an officer had probable cause to believe that a violation occurred, the "officer's motive in making the traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment.'" *Simmons*, 172 F.3d at 778 (internal citation and quotation omitted).

A traffic stop, however, must "last no longer than is necessary to effectuate the purpose of the stop," and "[t]he scope of the detention must be carefully tailored to its underlying justification." *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). During a routine stop, an officer is entitled to request a driver's license and vehicle registration, run a computer check for outstanding warrants, issue a citation, and request consent to search the vehicle. *Id.; Simmons,* 172 F.3d at 778. Furthermore, once a person provides consent to search, the clock re-starts for purpose of evaluating the reasonableness of the duration of the traffic stop. *United States v. Hernandez*, 418 F.3d 1206, 1209-10 (11th Cir. 2005).

**b. Search**

"[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few established and well-delineated exceptions." *Horton v. California*, 496 U.S. 128, 134 n.4 (1990) (quoting *Katz*, 389 U.S. at 357); *see also Arizona v. Grant*, - - - U.S. - - -, 129 S. Ct. 1710, 1716 (2009). One such exception is the knowing and voluntary consent of the person subject to the search. *United States v. Griffin*, 555 F.2d 1323, 1324 (5th Cir. 1977). Accordingly, an officer conducting a routine traffic stop may request consent to search the vehicle so long as the

ensuing consent is the product of an "essentially free and unconstrained choice." *Purcell*, 236 F.2d at 1281. However, when the Government relies upon consent to justify the lawfulness of a search, it "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Voluntariness is a question of fact based on the totality of the circumstances. *Purcell*, 236 F.2d at 1281. (Citations omitted).

## III. Analysis

Defendant challenges the validity and duration of the stop, as well as the lawfulness of the search of his vehicle.

### a. Validity and Duration of the Stop

Defendant contends that the stop was improper. During the hearing, however, Defendant admitted that he did not come to a complete stop until his vehicle was beyond the stop bar (and perhaps within the crosswalk). However technical this minor traffic violation may have been, Defendant violated FLA. STAT. § 316.075(1)(c) in Officer Ring's presence. Accordingly, Officer Ring had probable cause to stop Defendant's vehicle.

With respect to the duration of the stop, Defendant contends that Officer Ring prolonged the stop while she awaited for the arrival of a drug unit. By all accounts, however, no drug unit was ever called (nor did one ever arrive on scene). Furthermore, the other officers arrived contemporaneously with Officer Ring's initial questioning of Defendant.

Upon consideration of the above, the Court finds that the purpose of the traffic stop was lawful and its duration was reasonable. *See, e.g., Simmons*, 172 F.3d at 780 (finding a 30-minute wait for a computer check during a traffic stop reasonable).[15]

---

[15] Defendant does not contend that the *search* lasted an unreasonable length of time. Accordingly, the Court has only considered the period of time between the stop of the vehicle and the commencement of the search.

**b. Lawfulness of the Search**

The Government contends that Officer Ring received Defendant's free and voluntary consent to search his vehicle during the traffic stop.[16] In support of its position, the Government cites five factors typically applied to assess whether a defendant's underlying consent was freely and voluntarily given.[17]

The Government's position misses its mark. Defendant does not allege that he was coerced into giving consent or that his consent was involuntary. Instead, Defendant maintains he never provided Ring with consent to search his vehicle. Thus, the threshold issue before the Court is whether the Government has carried its burden of proving that Defendant consented to the search.

On the one hand, Officer Ring testified that she always asks drivers whether they will consent to a search of her vehicle and that, in this particular case, Defendant answered "No, I don't mind" and thus gave his consent. To the extent Officer Holmes' testified that Officer Ring almost always asks for consent to search a vehicle, there is some support in the record for Officer Ring's request. On the other hand, during this particular stop, Officer Holmes testified that he was standing directly behind Officer Ring during her initial encounter with Defendant and that he never heard Officer Ring ask Defendant for his consent to search the vehicle. Nor did he hear Defendant provide his consent. According to the Government, the other two officers at scene also never

---

[16]The *only* basis for the search asserted by Government is consent. The Government does not contend – and has waived – any argument as to whether Officer Ring conducted a protective search, seized anything in plain view, initiated her search on the basis of the occupants' criminal histories, or conducted a search incident to a lawful arrest of one of the vehicles occupants (*see Gant*, 129 S. Ct. 1710).

[17]*See, e.g.*, *Purcell*, 236 F.3d 1274 (reviewing defendant's consent to a vehicle search for voluntariness by applying factors); *United States v. Garcia,* 890 F.2d 355 (11th Cir. 1989) (applying factors to defendant's consent to search to review whether the consent was obtained through coercion).

heard Officer Ring ask for – or receive – Defendant's consent. Finally, in the absence of additional evidence concerning the compartment in which the gun was found, it seems somewhat incredible that Defendant would have freely and voluntarily consented to a search of his vehicle when he admittedly knew there was a gun in the center console.

Viewing the entirety of the evidence, the Court finds that the Government has failed to meet its burden of proving consent in order to justify the lawfulness of the search of Defendant's vehicle. In light of the entire record, Officer Ring's testimony concerning Defendant's consent is not credible. While the Court does not question her sincerity, Officer Ring's perception or memory of the traffic stop is simply not consistent with the accounts of her fellow officers and Defendant.[18] Accordingly, Defendant's Motion will be granted.

**IV. Conclusion**

For the foregoing reasons, it is **ORDERED** that Defendant Frank Mills' Motion to Suppress (Doc. 16) is **GRANTED**.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on June 17, 2010.

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
Frank Maurice Mills

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[18] Notwithstanding his self-interest, the Court is also inclined to give some weight to Defendant's testimony. During the entire stop, Officers Ring and Holmes testified that Defendant was, *inter alia*, polite, calm and cordial. (Tr. at 18 and 76). The Court found Defendant's demeanor to be no different while he was testifying during the hearing and, in general, Defendant's perception, memory, communication and sincerity appeared credible.